May it please the Court, my name is Laura Murray Chan, and I represent the petitioner Jonathan Reyes. And, Your Honors, I would like to reserve one minute of rebuttal time. The issue in this case is that Jonathan Reyes has shown a greater than 50% chance that he will be tortured in El Salvador, but the Board of Immigration Appeals incorrectly found the record equivocal as to the likelihood of torture. In doing so, the Board ignored important undisputed record evidence and misstated record evidence, precluding a proper aggregation of the total risk of torture as the case law requires. As this Court held in Cole v. Holder, where there is any indication that the Board did not consider all of the evidence before it, the decision cannot stand. Under Cole, misstating the record or failing to mention potentially dispositive evidence. Okay. What did the Board miss here? What did the Board miss here? Your Honor, the Board never addressed the torturous prison conditions in El Salvador. But the record has abundant evidence of life-threatening torturous prison conditions, evidence that the government Is there any reason to think that your client would go to prison? Yes, there is ample reason to believe that my client would go to prison. According to the record, 60% of so-called gang inmates in El Salvador are in fact U.S. deportees. And law enforcement's primary objective in El Salvador, according to the record, is to arrest and detain as many gang members as possible. So, yes, there is ample reason to believe. Moreover, Well, why would your client be identified as a gang member unless he participates after he goes back in gang activities? He has tattoos from being here. Is there any evidence that says the fact of having a tattoo means you're going to wind up in prison? There's ample evidence that the police specifically request persons in El Salvador, especially young men, to lift their shirts so that they can inspect whether or not there are tattoos. And, in fact, the petitioner has a tattoo on his back, NSU 13, which indicates affiliation with a gang. This is exactly what happened to his uncle, Jorge Hernandez, and the government has stated that Mr. Hernandez's statement as to having his shirt lifted and having been detained three times by the police, including being held in prison for 14 months, the government stated in its brief that this is credible, which means it must be taken as true. So we know it's happened to one person. But the problem here is you've got to demonstrate more likely than not, more than 50 percent. And there are an array of things that would give me pause if I were being sent back in those circumstances. And I understand why your client may not be happy about it. But what is there that demonstrates more likely than not these terrible things are going to happen to him there, particularly given that the BIA specifically recited that he acknowledged that he could seek to have the tattoos removed? Your Honor, I do not recall the BIA saying that. I recall the IJ, the immigration judge, stating that. I don't recall the BIA ever referencing the removal of tattoos. And moreover, the record does show that removal of tattoos results in disfiguring scars and that the police watch tattoo clinics and beat people who attempt to have their tattoos removed. Moreover, gang members watch the tattoo clinics. Because it is regarded as a punishable-by-death offense to have your tattoo removed, you may not do it. So they have an interest in knowing who is going to these tattoo clinics to have their tattoos removed. There's also evidence that it takes a period of time to have one's tattoo removed, as acknowledged in Cole v. Holder. So he would have the tattoo. His Uncle Jorge was paraded through the streets with his shirt off so that people could see the tattoo. And given the police officers' regular practice of lifting shirts, which is throughout the record, that this happens to young men constantly, there's little doubt. In fact, I would – Is there anything – if we were to rule in a client's favor, I mean, this would mean that every one with a tattoo would be automatically granted catholic. Is that what you're saying? Is that – Actually, no, Your Honor, I'm not saying that any person with a tattoo, a 60-year-old man or woman, doesn't fit the profile of a likely gang member and is probably not going to have his or her shirt lifted by the police. My client is the worst possible deportee. He is the type of deportee – his package is the most endangered type of deportee. He's a young male. He's tattooed with a numeral 13, which is connected in everyone's mind with one of the most violent street gangs in El Salvador, the MS-13. He's a former gang member. He's a U.S. deportee. He won't join or rejoin a gang, and he has no place to go. Seventy percent of homicides in El Salvador are committed against people. It sounds to me like getting a 13 tattoo on your back becomes an automatic thing in the United States. All you have to do is go to the tattoo parlor. You don't need to go to the INS to get a green card. You just go get yourself a tattoo if you're young. There are plenty of girls, male, plenty of girls. No place else to go. There are plenty of girls, so I'm not – That would be a very bad decision because you would be marking yourself as a member of a gang. That would create problems for naturalization. If for any reason you were arrested for a traffic violation. You don't need naturalization. If you've got cattle, if you can't be deported, you can just stay here. Well, I would think as a policy matter that's something that the court could take into consideration. If you don't – What I'm saying is your client doesn't have an individual record. What you seem to be relying on is entirely his demographics. And I don't think that's how it works. I mean, you had a determination. You had a factual finding. And I, Jay, in a different case with a different petitioner might find something else. Or perhaps in your client's case might have found something else. But what is wrong with the decision in this case? What's wrong with the decision in this case is that the board did not consider dispositive evidence. In Aguilar v. Ramos, similarly, the board did not consider the existence of death squads in El Salvador. And this court remanded. So it didn't consider it because it didn't mention it. We don't – you're not saying that they actually didn't look at it, right? They never uttered the term death squads once over the course of their opinion. I'm sorry? They never uttered the term death squads once over the course of their opinion or social cleansing groups, and nor did the IJ. And Cole says if there's any indication that the board did not consider there were evidence before it, the decision cannot stand. And what also suggests that the board did not carefully review the evidence is the number of actual errors it made, errors that are identical to errors that were made by the immigration judge. The board states things, says things are in the record that aren't. And if you'll give me one moment, I'll find examples of that. For example, the board indicated, as did the immigration judge, that the Salvadoran government prosecutes and convicts police officers for excessive use of force. The report doesn't state that anywhere. There is no reference to prosecution or conviction of police officers for excessive use of force. The board, like the IJ before it, stated that the police received training in constitutional law, again citing the State Department report, but the report does not say that. The board characterizes these types of trainings as the implementation of reform, but the State Department never references any police department reforms. It appears that the board got this from the IJ and did not necessarily review the IJ opinion for clear error because it makes exactly the same mistakes. And that is another indicator, that the board did not actually carefully review the record of evidence, the fact that it repeated mistakes and that it never once uttered the terms death squads or social cleansing throughout the opinion and never once referred to the atrocious prison conditions. Okay. You wish to save the remainder of your time for rebuttal? Certainly I will save the remainder of my time for rebuttal. Thank you, Your Honor. Okay. We'll give it to the Governor. Good morning. May it please the Court. My name is Anthony Norwood. I'm here today representing the Respondent. If I may go right into what Petitioner just said. Where she started her argument was with torturous prison conditions. It's not clear from this record, it's not established on this record, that Petitioner would go to prison. Jorge, his uncle, did not necessarily go to prison. Jorge lived outside of prison for several years, safely, working in a rehabilitation project before he got in trouble in El Salvador. The record does not show that deportees are automatically sent to prison in El Salvador. Petitioner has also repeatedly argued that the Board did not refer to the term death squads and social cleansing. But death squads and social cleansing appears in that Harvard report, which was published in 2007, written by students at Harvard. And throughout the record, wherever it's said, it's an allegation. There's no fact of death squads in El Salvador that actually, there's no proof of death squads focusing on deportees, and there's no clear probability that this Petitioner would face death squads. Jorge mentioned death squads, but Jorge, it's equivocal even from his own statement of what death squads are. He doesn't describe them. Obviously, Jorge didn't face a death squad. The point that should be made is that torture is an extreme concept. For an act to constitute torture, it must be an act causing severe physical or mental pain or suffering. It must be intentionally inflicted for a prescribed purpose by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim and not arising from lawful sanctions. We don't have evidence that that's what a Petitioner would face, and it's not evident. There's not enough – there's not evidence. There's certainly not compelling evidence that this Petitioner will face torture in El Salvador. So in your view, is the operative group deportees with gang tattoos? Is that the – what we should be looking at the evidence against? This is not a social group argument, Your Honor. This is not – we're not looking at groups. We're looking at the groups. Well, we are in the sense that he's saying that if he's sent back there, that it's more likely than not that he'll be tortured because he's a deportee. In other words, there are people walking – there's people walking around El Salvador right now with MS-13 tattoos all over themselves. So I guess the question is, what's distinguishing him from those people? Is it he's a deportee? Is that not true? One of his – one of his arguments is that deportees face difficulties in El Salvador. But it's – there's not compelling evidence that they face – that they face torture, which is a very extreme concept. The evidence is that the government knows when you arrive and you're a deportee, but then you're free to go. You're not – you're not necessarily arrested. You're not necessarily put in prison. As our brief shows and as the record shows, El Salvador is a very violent place. So you're not necessarily arrested and put in prison, but you have a greater than 50 The record does not compel that conclusion. I don't – the board and the immigration judge found that you don't have a 51 percent chance – more than 51 percent chance of having those fates. Jorge didn't have that fate. Other people in other cases haven't necessarily had that fate. It's a difficult – El Salvador is difficult. I mean – Do you comment on what she says? Are errors in the IJ's either interpretation of these country reports that are then adopted in effect in the BIA's, and therefore that alone is substantial evidence to overturn the determination? Well, I believe that the one that I remember vividly is death squads. And she says that the petitioner has said that the board and the immigration judge didn't refer to death squads. But the board and the immigration judge did look at the Harvard report. It's very clear they looked at the Harvard report. They looked at the country record – country report. This case went to the board once and then went back to the immigration judge, and there was another hearing on torture convention. There was more evidence. The immigration judge looked at all that evidence. It came back to the board for a second time. The fact that – that the immigration judge and the board didn't mention the term death squads, which I find very slightly in the record, if at all, is not substantial error. It's not compelling evidence. Death squads appears in the Harvard report, right? An allegation of death squads appears in the Harvard report. Is there anywhere else in the record? I can't confidently say that it is, Your Honor. But it's – Jorge mentioned death squads. But that's all he – she says death squads. That's all he says. There are death squads. He doesn't say more. Okay. All right. Thank you. Thank you. You have about five minutes for rebuttal. There are several points I'd like to make, and I will endeavor to keep these as organized as possible. With reference to Jorge, the government repeatedly says that this wasn't Jorge's fate. I believe the government even said he didn't go to prison. Jorge spent 14 months in prison. The government states this in its brief. The government says – government concedes that he was tortured by the police. Those are the government's words. They say that in their brief. So Jorge did go to prison. Now, there was a period of a few years before he went to prison, but there's no time frame on torture. You don't have to be tortured within your first year. No, but he has to prove more likely than not. So the fact that Jorge spent many years there without such an incident, and you've got one document, an incident doesn't compel a finding that it's more likely than not that your client will be tortured. There's not just one documented instance. He's an example, and I'm referring to him because the government referred to him so extensively. Jorge had grandparents, and he hid in their home. Jonathan has nobody in El Salvador. He has no one. He has no place to go and stay. It's not a coincidence that the Harvard report is entitled No Place to Hide. There is nowhere to go. There are other important differences between Jorge and Jonathan. Jorge grew up in El Salvador, according to the credible testimony. Jonathan didn't. Jonathan grew up in the United States. He came here at the age of 9. He's not El Salvadoran in nature. He would be noticed as not fitting, and he would be noticed as a deportee. Now, with reference to death squads, death squads appears throughout the record in multiple places. It's not just in the Harvard report, and it's not just in Jorge's statement. It appears in the Congressional Research Service report. It appears in the Council on Hemispheric Affairs report. It refers to the United States Agency for International Development report. It appears in numerous news article reports. And when we refer to allegations of death squads, according to the Harvard report, established human rights institutions have documented the involvement of PNC officials and national police officials in extrajudicial killings, and speaks to the fact that a lot of these death squads originate in police departments. That's in the Harvard report. And in Madrigal, this Court noted that when the petitioner stated that his persecution was the result of activities by a Mexican gang called Los Cetas, and there was no other plausible explanation for what had happened to him, that Mr. Madrigal's explanation should be credited. When international and domestic human rights organizations and our own government, the Congressional Research Service, and multiple other organizations state that there are death squads, where there is a widespread conviction like this. Is there a State Department report? The State Department report doesn't use the term death squads. The State Department report is about 20 pages long, and well over 75 percent of it refers to things that have absolutely nothing to do with Jonathan, whereas these other reports that I've referenced are about gangs and the treatment of gang members, both by the police within the prisons, by death squads, and by rival gang members. So the State Department is not the authoritative voice on what happens to gangs in El Salvador. It simply isn't, just by virtue of the fact that it's superficial. It is our government's objective assessment of what's going on in other countries. Other organizations may have agendas, but the State Department is there to make objective determinations on behalf of our government. So it's given particular weight, what the State Department's reports say. Well, the Congressional Research Service is also part of our government, and in a report of 2011, it referenced credible reports of extrajudicial youth killings by these vigilante groups. That's also our government, and that's at page 380 of the record. The United States Agency for International Development... That's not so much of a finding as credible reports. Credible reports, in the absence of alternative explanations, I believe have to be given weight, just as they were in Mandarinville, just as his explanation was credited, because there's no alternative explanation for the soaring homicide rates that these groups refer to. And if I may, Your Honor, the U.S. Agency for International Development is also part of our government, and they specifically reference El Salvador's death squad problem, commenting on institutional and extrajudicial social cleansing. Death squads are groups that engage in social cleansing with the goal of exterminating suspected gang members. So these groups appear throughout the record, both in documentation by human rights groups and in three different or two different reports by our own government. Okay. Thank you. Case, this argument stands submitted.
judges: KOZINSKI, McKEOWN, CLIFTON